BOYER, Chief Judge
(dissenting).
I respectfully dissent. The facts recited in the majority opinion do not, in my view, prove second degree murder. That the decedent was appellant’s sixth husband and the marriage was of six-days duration has no legal relevance. The pistol was not a single shot, it was a single action. It did not require reloading after each shot, only recocking. Considering the evidence in a light most strongly against appellant, including inferences and suspicions, (which I do not conceive to be the law of this State) it proves at most manslaughter and not even that beyond and to the exclusion of a reasonable doubt.
In my view appellant was justified in her actions. By their very nature mothers are expected to protect their young. The decedent had already demonstrated his viciousness toward appellant’s 21-month-old child by forcibly pouring down its throat a large quantity of cough syrup accompanied by a handful of aspirin. We can and should take judicial notice that an overdose of aspirin can be lethal. Those actions on the part of decedent accompanied by his repeated statements that he would “shut her up for good” certainly would lead a reasonably prudent person to believe that danger was imminent. (Darty v. State, supra) The parties resided in a small house and there was no evidence that appellant had a reasonable opportunity to escape with her baby without her husband being in hot pursuit. On the contrary the evidence revealed that she feared her husband and for good cause. At trial she testified as follows:
“Q If you were truly afraid that this man was • about to kill your child, Mrs. Bates, and he was in the back of the house and you were sitting next to the front door, why did not you take the baby out for a walk and be gone, if you’re truly afraid that the man is about to kill a 21-month-old girl child ?
“A Because I knew he would come after us.
4* jfc 4s ‡
“Q (Mr. Jones continuing) Then what did he do that would indicate that if you went for a walk and kept on going to your mother’s house that he would follow you all the way over there to kill the child ?
“A I knew him, and I knew what he would do.”

“Q Was there anything to stop you from walking out the front door?
“A He would have come after me. He would have killed me and the baby.

“Q Well, Mrs. Bates, if you couldn’t go to your mother’s house, if you were afraid to walk out of there, that he would come get you, and the door was wide open, and you had the feeling when you walked back with the gun he was going to kill your baby, well then what alternative did you have but to kill him ?
“A I wanted to scare him.
:jí 4c 4* 4* sj«
“A I never meant to fire the gun in him.”
A conviction of murder may not rest on speculation and conjecture. Had appellant failed to heed her husband’s threats to “shut her up for good” and had he in fact done so, appellant would have been justifiably subject to severe criticism for failure to act in defense of her baby’s life. The record is totally devoid of any evidence that appellant acted other than in defense of her baby in a situation such as would have induced any reasonable and prudent person to believe that danger was imminent. She well knew that once he undertook to carry out his threats she would be powerless to stop him. It would then be too late. In her words: “He would have *453 come after me. He would have killed me and the baby.”
It is easy for us now, in a mindful, comfortable and relaxed atmosphere, to theorize on what appellant should have done and what alternate courses may have been considered by her. But she did not enjoy the luxury of such an opportunity for reflection. She acted, according to the un-contradicted evidence, in defense of her child. I would reverse.